## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANCES HINES, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) No. 15-cv-11897-DJC |
| | ) |
| BOSTON PUBLIC SCHOOLS, | ) ) |
| Defendant. | ) ) ) ) ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                              **October 15, 2018**

### I.    Introduction

Plaintiff Frances Hines ("Hines") asserts claims against Defendant Boston Public Schools ("BPS") arising under Mass. Gen. L. c. 151B, § 4, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (the "ADA") and the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* for discrimination, retaliation and failure to accommodate based upon her alleged disability as well as for breach of contract. D. 22. The Court previously dismissed Hines' claim for a violation of due process under 42 U.S.C. § 1983. D. 32. BPS has moved for summary judgment on all remaining counts. D. 44. For the reasons stated below, the Court ALLOWS the motion.

### II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the

1

outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (quoting Anderson, 477 U.S. at 249) (alteration in original). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in [her] favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

The following facts are drawn primarily from BPS's statement of material facts, D. 44, Hines' statement of material facts, D. 46,[1] and other supporting documents[2] and are undisputed unless otherwise noted.

---

[1] Hines filed a "Statement of Material Facts," D. 46 at 11, but as required under D. Mass. L.R. 56.1, this statement failed to provide "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried," except for a blanket statement that she "objects to" many of the statements of facts asserted by BPS. D. 46 at 11.

[2] Neither of the parties submitted an affidavit attesting to the authenticity of their respective exhibits. Hines argues that because BPS failed to do so, all BPS's exhibits should be stricken. D. 46 at 1 n.1. The Court, however, has relied upon the exhibits cited in this opinion despite the missing affidavits because Hines has cross-referenced BPS's exhibits and relied upon them and has not raised any well-founded objection to their authenticity or admissibility at trial, but also because they bear clear indicia of reliability, including but not limited to that some bear signature blocks stating "signed under the pains and penalties of perjury," or are on BPS letterhead. See Asociación De Periodistas De P.R. v. Mueller, 680 F.3d 70, 78 (1st Cir. 2012) (noting that courts "have great flexibility with regard to evidence that may be used on a Rule 56 proceeding" and

Hines has been an employee of BPS since 1995.  D. 44 ¶ 1.  Hines currently works at Higginson Lewis K-2 School.  D. 44 ¶ 4.  Prior to her position at Higginson Lewis, Hines worked at the Tynan School.  D. 44 ¶ 3.  Prior to her current position, Hines worked at the David Ellis School ("Ellis School") as a paraprofessional.  D. 44 ¶ 1; D. 22 ¶ 4.  As defined by the Collective Bargaining Agreement ("CBA") between the School Committee of the City of Boston and the Boston Teachers Union, a paraprofessional is a "non-certified individual employed by the Boston School Committee whose function is to assist teachers and other school personnel."  D. 44 ¶ 1; D. 44-4 at 19.  The job description for a paraprofessional for the Ellis School Special Education program describes a paraprofessional as someone who assists the classroom teacher with instructional activities, facilitates classroom discipline and performs "Lunch Duty/Bathroom Duty."  D. 44 ¶ 1; D. 44-2 at 4.

Hines characterizes BPS' treatment of her from 2003 to 2015 as "abusive."  D. 46-2 at 102. In 2003, before Hines worked at the Ellis School, Hines was issued a "letter of reprimand" for "insubordination" and "making inappropriate comments."  D. 44 ¶ 6; D. 44-6 at 42.  The letter explained that on several occasions, Hines has been "spoken to" about her behavior by the school principal, a union representative, the teacher in charge, Hines' previous teacher and the current classroom teacher.  D. 44-6 at 42.  Hines wrote a letter in response, asserting that she had followed instructions while colleagues had been "unprofessional" towards her and engaged in "inappropriate comment[s]."  D. 44-6 at 44.  She wrote further that, because another teacher's

affirming reliance upon certain evidence by the Court where plaintiffs provided "no serious basis for disputing the authenticity" of same) (internal quotation marks and citation omitted); see also Cerqueira v. Cerqueira, 828 F.2d 863, 865 (1st Cir. 1987) (although noting the general rule requiring that the exhibits by supported by affidavit, but affirming the Court's reliance on same where the record otherwise supported that "the document is what it purports to be").  The Court has not relied upon exhibits that do not bear such indicia of reliability.  See, e.g., D. 44-7 at 2 (missing pages and signature of declarant).

inappropriate behavior had not been addressed in the meeting regarding Hines' reprimand, Hines felt there was "bias" against her.  Id.

In 2004, Hines transferred to the Ellis School.  D. 44 ¶ 1; D. 22 ¶ 4.  Hines described her relationship with Ellis School principal Carlos Gibb ("Gibb") at the Ellis School as "not good." D. 46 at 23.  Beginning with Hines' first year at the Ellis School (the 2004-2005 school year), Hines' superiors noted several issues with Hines' performance.  D. 44-5 at 12-17.  Hines was deemed to have "not met standards" in six categories out of seventeen total categories.  Id. at 12-13.  Hines' evaluator noted that Hines "ha[d] not demonstrated that she ha[d] enhanced the learning environment in the . . . classroom.  In formal and informal evaluations, the students [did] not see her as the person who [could] effectively help them with their daily work."  Id. at 17.  Below her signature on the evaluation, Hines wrote that she "[did not] agree with the content of [the] evaluation."  D. 44-5 at 12.

In 2005, Hines fractured her leg in a car accident.  D. 46 at 16, 20; D. 46-2 at 19.  Hines took six months of medical leave to undergo surgery and physical therapy before returning to the Ellis School.  D. 44-4 at 2-5; D. 46 at 20; D. 46-2 at 19-20.  Before Hines began working for BPS, Hines was diagnosed with a "cognitive impairment" that, according to Hines, means she needs "things written for [her]" and she does not "process as fast as somebody else."  D. 46-2 at 22.

In September 2006, Hines filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") alleging that she had been discriminated against by BPS, Gibb and George Martin, the Ellis School assistant principal, on the basis of "Race [and] Color."  D. 44 ¶ 8; D. 44-5 at 60-63; D. 46 at 11.  Hines alleged that Gibb, who is Hispanic, and Martin, who is Caucasian, discriminated against her as an African-American woman by yelling at her, making rude hand gestures towards her and treating her differently than other employees.  D. 44 ¶ 10;

D. 44-5 at 60-63; D. 46 at 13.  The MCAD issued a lack of probable cause finding on July 12, 2008.  D. 44 ¶ 10; D. 44-5 at 65.  Hines appealed and a hearing, the MCAD affirmed its finding. D. 44-5 at 73.

Hines continued to receive mixed performance evaluations.  For example, in her evaluation for the 2006-2007 school year, an evaluator noted that Hines' "handling of discipline ha[d] improved over the past two years."  D. 44-5 at 47.  The evaluator also noted, however, that Hines failed to give "follow up [] directions" to students and did not "inform students what she expected." D. 44 ¶ 11; D. 44-5 at 46.  That year, Hines was rated as "meets expectations" in all but two categories.  D. 44-5 at 42-45.

In 2008, Hines underwent a follow-up surgery for her leg and received further physical therapy.  D. 46-2 at 20.  When Hines returned from medical leave, she was assigned to work in a classroom with Ms. Salant.  D. 46 at 13.  According to Hines, in October 2008, Salant yelled "so very loudly that one of [Hines'] students started crying uncontrollably."  D. 46-1 at 9; D. 46 at 13. According to Hines, Hines requested a transfer, but her request was not granted.  D. 46 at 13-14.

On November 20, 2008, Hines filed another complaint with the MCAD alleging retaliation by BPS for filing her previous MCAD complaint.  D. 44 ¶ 14; D. 44-5 at 75; D. 46 at 11.  Hines alleged that after returning from medical leave she had been assigned to work with a teacher (Salant) who BPS knew had "harass[ed]" and "disrespected" Hines in the past.  D. 44-5 at 75. Hines further alleged that when she asked to switch to another classroom, she was ignored.  Id. The MCAD issued a lack of probable cause finding as to the 2008 MCAD complaint on March 28, 2011.  D. 44-5 at 79-82.

On November 21, 2008, Hines wrote to Gibb, the principal of the Ellis School, and requested an accommodation to enter school through the front door because walking around to the

back entrance was made difficult by a "walking disability." D. 46 at 14; D. 46-2 at 47. BPS asserts that Hines did not submit this request to the BPS Office of Equity. D. 46-2 at 93.

In 2010, Patricia Niles-Randolph took over for Gibb as principal of the Ellis School. D. 44 ¶ 16. On April 9, 2010, Niles-Randolph wrote a letter to Hines regarding Hines "Leaving Students Unsupervised," "Leaving [the] School Building during Contractual Work Time" and "Disrupting the School Assembly by Shouting Derogatory and Threatening statements" concerning Hines' conduct on March 18, 2010. D. 44 ¶ 19; D. 44-7 at 10. The letter explained that Hines' conduct was "unacceptable." D. 44-7 at 10. On April 18, 2013, Hines wrote a letter in response, denying the allegations in the letter and explaining, among other things, that at the time in question, one of the students had "assault[ed]" her and she had gone to the teacher's lounge to ice her injured foot. D. 44-7 at 17. Hines subsequently also corresponded several times with Niles-Randolph about her perceived need for more personnel to supervise the students with disabilities. D. 44-7 at 18. In response, Niles-Randolph convened an "Investigatory Meeting" with Hines on April 30, 2010. D. 44-7 at 13. In directing Hines to attend the meeting, Niles-Randolph advised Hines that her "allegations and concerns if substantiated [would] constitute a sincere need to reevaluate [Hines'] classroom placement." D. 44-7 at 13.

On May 3, 2010, Niles-Randolph wrote to Hines in response to her correspondence "requesting needed support in the workplace." D. 44-7 at 22. Niles-Randolph wrote that "[i]n pursuant [sic] of the earnest concern for your safety and wellbeing within the classroom environment and to minimize the need for you to require medical treatment for job related stress or injuries," Hines would be assigned to a kindergarten classroom at the Ellis School beginning May 10, 2010. Id. Niles-Randolph opined that Hines' assistance in the new classroom would be "welcomed" and that "the change [would] provide a safer more manageable student environment

for [Hines] to work in." Id. The next day, Hines wrote to Niles-Randolph that she had "never ask[ed] for a support staff because of [her] inability to manage [her] classroom students." D. 44-7 at 24. Rather, Hines had requested support staff because her students were being "punished and disciplined for 40 minutes during Lunch and recess in the classroom, and they [were] exhibiting unsafe behaviors and the administrators [were] aware that [Hines] [had] a walking disability." Id. Additionally, Hines asserted she had not received a response from Niles-Randolph regarding "verbal[] abuse" by Catherine MacCuish, the coordinator for a cluster of classrooms at the Ellis School. Id. Finally, Hines requested that she remain in the Special Education Program, rather than switching to the new kindergarten, regular education classroom as Niles-Randolph had proposed. Id.; D. 44 ¶ 19.

On May 12, 2010, Hines submitted a "Voluntary Self-Identification Form" for employees with disabilities to the BPS Office of Equity, requesting that BPS "modify [her] work schedule" to accommodate her disabilities. D. 44 ¶ 24; D. 44-7 at 32; D. 46-2 at 49. Where asked to describe the nature of her disabilities on the form, Hines wrote: "[w]alking disability, Attention Deficit, Learning Disability, On File at Central Office. Please accomdate [sic] as needed." D. 46-2 at 49. Hines also wrote that she had previously requested accommodations that had not been provided from Gibb, Niles-Randolph and MacCuish. Id. With the form, Hines submitted a letter from her doctor explaining that Hines had a "weak left leg," a "stiff knee," attention deficit disorder and a "learning disability." D. 44-7 at 34; see D. 44-7 at 36. Hines' doctor did not, however, list any recommended accommodations for these disabilities. D. 44 ¶ 24; D. 44-7 at 34. Larry Faison ("Faison"), the senior equity specialist at the BPS Office of Equity, attests that he and Hines discussed her request for an accommodation over the phone, in person and over email in months after Hines submitted her request. D. 44-7 at 27; see D. 44 ¶ 25.

After Hines' initial exchanges with Faison in the BPS Office of Equity, and while Hines' 2008 MCAD complaint was pending, Hines filed two more administrative complaints against BPS. Hines first filed a complaint with the United States Department of Education Office for Civil Rights ("OCR") on July 19, 2010 alleging retaliation by BPS against Hines for having filed the 2006 and 2008 MCAD complaints.  D. 44 ¶ 15; see D. 44-5 at 84.  OCR closed the complaint effective January 14, 2011, finding insufficient evidence of her claims.  D. 44 ¶ 20; D. 44-6 at 9. On December 22, 2010, Hines filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"), alleging age-based discrimination by BPS against Hines.  D. 44 ¶ 15; D. 44-6 at 12.  After an investigation, the EEOC closed the file on Hines' charge on June 7, 2011.  D. 44 ¶ 21; D. 44-6 at 20.

In September 2010, Faison requested further documentation from Hines regarding her disability, D. 44 ¶ 25; D. 44-7 at 36, but, according to Faison, the Office of Equity did not hear back from Hines until February 25, 2011, D. 44 ¶ 26; D. 44-7 at 27.  On February 25, 2011, Hines submitted a letter from her doctor dated January 19, 2011, which noted that Hines was feeling "under alot of pressure at her job resulting in poor sleep and increasing alopecia" and recommended Hines take three months off of work to recover.  D. 44 ¶ 26; D. 44-7 at 27, 38.  Hines attached a clinical neuropsychology report to her letter, in which the clinician recommended the following accommodations for Hines:  assigning Hines to a small class with a single teacher, giving Hines written instructions to make her job responsibilities clear, having Hines attend professional development workshops and assigning a peer mentor to Hines to "help her learn ways to cope with difficult class situations and for support."  D. 44-7 at 42.

Also in February 2011, Norman Townsend ("Townsend") became the principal of the Ellis School.  D. 44 ¶ 22; D. 44-6 at 50.  At the time, Hines was on a leave of absence as was

recommended by her doctor.  D. 44 ¶ 22; D. 44-6 at 50.  Faison attests that he spoke to Hines before she returned from her medical leave in April 2011, explaining that he was working with Townsend to respond to Hines' requested accommodations.  D. 44 ¶ 27; D. 44-7 at 27.  Townsend confirmed that he spoke with Faison regarding Hines' accommodation.  D. 44-6 at 51.  According to Faison, Hines declined the support of a peer mentor.  D. 44-7 at 28.  When Hines returned from medical leave on April 15, 2011, Townsend attests that he met with Hines to discuss her new assignment, which would last until the end of the school year.  D. 44-6 at 51.  Townsend attests that he explained Hines would be assigned to one classroom for the remainder of the year, which was a regular third grade classroom with twenty-three students, and Hines would return to a special education classroom the following year.  D. 44-6 at 51.

BPS returned Hines to a special education classroom for the 2011-2012 school year as planned.  D. 44 ¶ 30.  A series of disputed circumstances led to BPS moving recess indoors for the special education students whom Hines was supervising.  D. 44¶ 31.  BPS and Hines each identify the other as the reason for needing to move the students inside.  See D. 44 ¶ 31; D. 46-1 at 42.  Hines was physically assaulted by a student in February 2012, causing Hines to take medical leave.  D. 44 ¶ 33; D. 46 at 17.

On February 15, 2012, Hines submitted a written statement of concern to the Massachusetts Department of Elementary and Secondary Education (the "Department").  D. 44 at 12 n.5; see D. 46-1 at 41.  Hines alleged that a teacher singled her out and accused her of not having good management skills in front of staff and students.  D. 46-1 at 42.  The Department advised Hines that personnel issues fall under the jurisdiction of BPS and Hines should address her concerns with representatives of BPS's Human Resources Department.  Id.  The Department did find, however, that the Ellis School was out of compliance with relevant regulations because it had separated

students with disabilities from other students in the lunch room and taken away outdoor recess from students with disabilities.  Id. at 43.

On February 23, 2012, Hines filed a third complaint with the MCAD, alleging that BPS discriminated against her on the basis of her disability (difficulty walking) and retaliation for filing her previous complaints.  D. 44 ¶ 36; D. 44-6 at 26.  After an investigation, the MCAD issued a lack of probable cause finding on August 2, 2014.  D. 44 ¶ 36; D. 44-6 at 29.

According to Hines, she was transferred to the Tynan School from the Ellis School "involuntarily" in 2013.  D. 46 at 6.  A BPS official who was part of the decision-making team for paraprofessional work assignments at the time, however, attests that Hines was "excessed" from the Ellis School and participated in a selection process for paraprofessionals in the "Excess Pool." D. 44-1 at 18; D. 44-9 at 8-9.  The BPS official attests that Hines submitted two preferences for new placements out of a possible three preferences.  D. 44-9 at 8-9.  She further attests that "paraprofessionals are made aware that if they do not make three choices, it could leave them up for placement at the discretion of HR."  Id. at 8.  Because the two positions Hines ranked were unavailable and Hines had requested a "Sped Autistic program" as her first choice, BPS placed Hines in the "Tynan Elementary Sped Autistic position."  Id. at 9.

Hines attests that despite having told the principal at the Tynan School about her accommodations, Hines was required to go up and down stairs as part of her job at the Tynan School.  D. 46-2 at 101.  On March 5, 2014, BPS provided an accommodation for Hines to "limit going up and down stairs when possible."  D. 46 at 26; D. 46-2 at 63.

Hines alleges that in October 2015, she was "assaulted" by a teacher, Mr. Monopoli ("Monopoli"), and that Monopoli "stopped" Hines' accommodations.  D. 46 at 7.  Hines attests that on October 30, 2015, Hines told an administrator that Monopoli had put his hand in her face.

D. 46-2 at 102.   Hines further attests that "[t]o the best of [her] knowledge, the Director of Personnel never contacted [her] about the assault upon [her] by Mr. Monopoli." D. 46-2 at 103. According to Hines, Monopoli told Hines he was going to leave the "bad children" with Hines because of her accommodations.   D. 46 at 22; D. 46-2 at 102.   Hines asserts that she went on medical leave because Monopoli had threatened her.   D. 46 at 22; D. 46-2 at 102.

In November 2015, the BPS Office of Equity granted Hines several accommodations as a result of her requests.   D. 44-7 at 56.   Hines was permitted to supervise students from the top of the stairs when transitioning between floors and proceed at "an appropriate pace" down the stairs once the stairwell was clear.   Id.   Hines was given the opportunity to work in the "smallest class size available" at the school.   Id.   Hines would also receive written instructions from the principal so that she would be "clear with the responsibilities of [her] job."   Id.   Hines alleges in her complaint that BPS did not provide the accommodations as promised.   D. 22 ¶ 22.

On January 25, 2016, Hines emailed the principal at her school, Marie Mullen, describing the events with Monopoli on October 30, 2015.   D. 46-2 at 70.   Hines did not mention her disability or any accommodations.   Id.   Also in January 2016, on January 8th, Hines' doctor wrote a letter to BPS affirming that Hines was "able to perform her essential functional duties with or without accommodation."   D. 46 at 28; D. 46-2 at 86.

## IV.   Procedural History

Hines instituted this action on May 29, 2015.   D. 1.   On August 30, 2016, the Court allowed BPS's motion to dismiss the original complaint without prejudice and granted Hines leave to file an amended complaint.   D. 18.   Hines filed an amended complaint on January 3, 2017.   D. 22. BPS moved to dismiss the amended complaint on February 6, 2017.   D. 24.   The Court denied the motion to dismiss, except with respect to Hines' due process claim under 42 U.S.C. § 1983.   D. 32.

BPS has now moved for summary judgment.  D. 44.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 47.

## V.     Discussion

### A.     <u>Disability Discrimination and Reasonable Accommodation</u>

To prove a disability discrimination claim, Hines must show that "(1) [s]he suffers from a disability or handicap, as defined by the ADA and [Mass. Gen. L. c.] 151B, that (2) [s]he was nevertheless able to perform the essential functions of [her] job, either with or without reasonable accommodation, and that (3) [BPS] took an adverse employment action against [her] because of, in whole or in part, [her] protected disability."  <u>Tobin v. Liberty Mut. Ins. Co.</u>, 433 F.3d 100, 104 (1st Cir. 2005) (collecting cases).  To prove a reasonable accommodation claim, Hines must show the same first two factors as under a discrimination theory, but must also show that BPS, "despite knowing of [her] disability, did not reasonably accommodate it."  <u>Id.</u> at 107 (citing <u>Estades–Negroni v. Assocs. Corp. of N. America</u>, 377 F.3d 58, 63 (1st Cir. 2004)).

### 1.     *Disability*

The threshold question for Hines' claims of disability discrimination and failure to provide a reasonable accommodation is whether Hines is "disabled" within the meaning of the ADA.  To qualify as "disabled," Hines must show that she has "a physical or mental impairment that substantially limits one or more of [her] major life activities," "a record of such impairment" or is "regarded as having such an impairment."  <u>Bailey v. Georgia-Pac. Corp.</u>, 306 F.3d 1162, 1166-67 (1st Cir. 2002) (citing the ADA, 42 U.S.C. § 12102(2)); <u>see</u> <u>Mulloy v. Acushnet Co.</u>, 460 F.3d 141, 154 (1st Cir. 2006) (noting that "Massachusetts' state-law counterpart to the ADA, Chapter 151B, § 4 . . . track[s] the ADA in virtually all respects" and, therefore, courts apply federal case law under the ADA when adjudicating disability claims under Chapter 151B) (internal citation and

quotation marks omitted).   Hines attests that her disabilities are "[a]ttention deficit [disorder], [l]earning [d]isability, [and] walking impairment which makes it difficult walking up and down stairs."  D. 44-8 at 5.  The ADA includes "walking" in its definition of "major life activities."  42 U.S.C. § 12102(2)(A).  That "walking" is included in the statute, however, does not end the inquiry.  Hines' walking must be "substantially limit[ed]" to qualify as a disability under the ADA. Bailey, 306 F.3d at 1166.

BPS argues that Hines' walking is not "substantially limited."  In support of this argument, BPS points to Hines' responses to interrogatories, in which she explains:  "[t]he reason I need accommodation is because it takes me longer to escort students up and down stairs."  D. 44-8 at 5. Hines also clarifies that she "can do [her] essential job functions with or without accommodations." Id.  One of Hines' treating physicians offered the same assessment.  See D. 46-2 at 86.  Another one of Hines' treating physicians also opined in April 2010 that it would be "difficult" to get Hines a disabled pass for the subway because Hines reported she could walk a quarter of a mile and climb stairs if she had a railing to hold.  D. 44-1 at 6 & n.1; D. 44-8 at 13.

Accordingly, based on the present record, no reasonable jury could determine Hines' walking was so limited as to make her eligible for the protections of the ADA.  Moreover, Hines' only assertion of difficulty walking relates to climbing stairs.  Although the First Circuit has not determined whether climbing stairs is considered a "major life activity" under the ADA, other courts that have considered the question have held that it is not.  See Harding v. Cianbro Corp., 436 F. Supp. 2d 153, 173-74 (D. Me. 2006) (collecting cases); see also Reyes-Garay v. Integrand Assurance Co., 818 F. Supp. 2d 414, 437 n.31 (D.P.R. 2011) (collecting cases and noting that "all the courts" that had considered whether climbing was a major life activity had "answered in the negative").  Hines, furthermore, concedes that she is able to climb stairs, but requires additional

time to do so.  Hines' need for additional time climbing stairs also does not make Hines disabled under the ADA.  See Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 189 (1st Cir. 2011) (affirming finding that plaintiff with epilepsy was not "disabled" under the ADA).  To the extent Hines points to BPS's history of accommodations for Hines' physical limitations, that such accommodations may have been given, even when not legally required, does not satisfy her burden of showing that she is "disabled" for the purposes of her claim under the ADA.

The Court further concludes that Hines' cognitive limitations do not make her disabled within the meaning of the ADA because she has made no showing in this record about how those alleged disabilities affected any major life activities or her job at BPS.  See Castro-Medina v. P&G Commer. Co., 565 F. Supp. 2d 343, 364 (explaining that "[a]n ADA claimant must specify which major life activity has been limited and only those grounds specifically raised [would] be considered by [the] court").

Although Hines is not "disabled" within the meaning of the ADA or Chapter 151B, Hines could still be eligible for protection if BPS "regarded" Hines as having an impairment and subjected her to an action prohibited by those statutes.  The ADA, as amended in 2008, specifies that an individual may be "regarded as having [] an impairment . . . whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A) (internal quotation mark omitted).

BPS argues that, despite arranging for certain accommodations to Hines, it did not "regard" her as being disabled.  D. 44-1 at 6-7.  In support of its arguments, BPS points to a letter from September 2010, in which Faison from the BPS Office of Equity wrote to Hines explaining that her weak leg and stiff knee "[did] not meet the requirements of a qualified individual with a disability." D. 44-7 at 36.  Faison also explained that if Hines wished to have her learning disability

14

and attention deficit disorder considered as the bases for an accommodation, Hines would need to provide documentation indicating, among other things, the limitations of Hines' disability, the accommodations her doctor would suggest and what would be needed for Hines to perform the essential functions of her job.  Id.  Such perception of Hines as not being disabled was bolstered by the MCAD's conclusion in 2014 that Hines' "'walking disability' [did] not amount to a legally recognizable disability because [Hines] produced no evidence of a substantial impairment of a major life activity."  D. 44-1 at 6; D. 44-6 at 37.

Hines contends that she "can prove that [BPS] regarded her as having [an] impairment," D. 46 at 2, but she has not done so.  In support of this argument, Hines cites to statements in her affidavit, in which she attests that she 1) gave a psychometric assessment test to BPS in 2008 that diagnosed her with attention deficit disorder and a learning disability and 2) told BPS on November 21, 2008 that she had a "walking disability."  D. 46-2 at 100.  Hines does not, however, provide any evidence suggesting that BPS adopted a view of Hines as disabled as a result of receiving these documents.  Cf. Izzo v. Genesco, Inc., 171 F. Supp. 3d 1, 6-7 (D. Mass. 2016) (finding a genuine dispute of material fact as to employer's regard of employee as disabled where employer claimed employee had a drug or alcohol problem despite employee denying such a problem).

### 2.   *Adverse Employment Action*

Even if Hines had presented evidence sufficient to show BPS regarded her as disabled, Hines would still have to show that she suffered an adverse employment action because BPS regarded her that way.  The First Circuit has held that for an employment action to be adverse:

> [t]ypically the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities,  . . . or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service.

Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (internal citations omitted).  Although her

claims are not a model of clarity, the Court surmises that Hines is basing her claims for disability

discrimination on three distinct events:  her transfer to a special education classroom in 2011, her

transfer to the Tynan School in 2013 and BPS's alleged failure to accommodate Hines in 2015.

Hines' theory about BPS's adverse employment actions against her in 2011-2012 can be

summarized as follows:  BPS assigned Hines to a special education classroom in 2011 where she

would have to climb stairs, D. 22 ¶ 12, BPS knew Hines would be a "target of assaultive conduct"

by the students in that classroom because of Hines' disability, Id. ¶ 14, Hines was assaulted by a

student in February 2012, Id. ¶ 15, and BPS refused to transfer Hines to a different classroom, Id.

¶ 18.  BPS has provided specific, uncontested evidence showing that in 2010 Hines requested only

a "modified work schedule" and did not mention stairs or being relieved of escorting students.

D. 44-1 at 16; D. 46-2 at 49.  BPS has also offered uncontroverted evidence that it communicated

with Hines over the phone, in person and through email to accommodate her request.  D. 44-7 at

27.  Faison from the BPS Office of Equity worked with Principal Townsend to accommodate

Hines.  Id.; D. 44-6 at 51.  When Hines returned to work in April 2011 after taking medical leave,

it is undisputed that Principal Townsend met with Hines to discuss a plan to accommodate her

needs going forward.  D. 44-6 at 51.  Townsend and Hines agreed Hines would be assigned to a

regular third grade classroom for the remainder of the year and Hines would return to a special

education classroom the following year.  D. 44-6 at 51.  The move was consistent with Hines'

request to Niles-Randolph the year before to remain in a special education classroom when Niles-

Randolph transferred Hines to non-special education, kindergarten classroom.  D. 44 ¶ 19; D. 44-

7 at 24.  Even in Hines' own affidavit, there is no assertion that supports Hines' claim that BPS

assigned Hines to the special education classroom in 2011 because it knew students in the class would assault Hines.  See D. 46-2 at 100-103.

In sum, Hines has not provided any specific, admissible evidence suggesting that BPS placed Hines in a special education classroom in 2011 because it knew children would assault her there, much less that the children's assaults would be triggered by Hines' alleged disability.  See González-Piña v. Guillermo Rodríguez, 407 F.3d 425, 431 (1st Cir. 2005) (remarking that "'[t]he mere scintilla of evidence' in the nonmoving party's favor is insufficient to defeat summary judgment") (citation omitted); Betances v. Sea-Land Serv., 248 F.3d 40, 43 (1st Cir. 2001) (affirming that "statements contained in a memorandum or lawyer's brief are insufficient, for summary judgment purposes, to establish material facts"); Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991) (explaining that party opposing summary judgment must submit "definite, competent evidence" that is not "conjectural" or "merely colorable") (citation omitted). The Court concludes, therefore, that with respect to BPS's interactions with Hines during the 2011-2012 school year, Hines has not met her burden to "demonstrate that a trier of fact could reasonably resolve [this] issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).

Hines next argues that her "involuntary" transfer to the Tynan School in 2013 constituted an adverse employment action.  D. 46 at 6; see D. 22 ¶ 23.  Hines has presented no evidence that her transfer was due to her disability or retaliation for her complaints of harassment.  Rather, the uncontroverted evidence shows that Hines was excessed from the Ellis School at the end of the 2012-2013 school year, given the opportunity to rank preferences for where she would work the following year, ranked a special education program as her first choice and was assigned to work as a paraprofessional in a special education program.  D. 44-9 at 8-9.  Hines was transferred from

one school to another in the same position (paraprofessional) into the type of classroom she requested.  See Thornton v. UPS, Inc., 587 F.3d 27, 35 (1st Cir. 2009) (affirming district court's finding that employee was not "adversely affected" by his work assignments because "at all relevant times, [the employee] selected his own work assignments").  Although Hines alleges that she was made to climb stairs at the Tynan School, there is no evidence to support the contention that the stairs at the Tynan School somehow rendered the transfer "adverse."  It is undisputed that there were stairs at both the Ellis School and the Tynan School.  See, e.g., D. 46 at 14, 23.  The evidence also shows BPS provided an accommodation for Hines while at the Tynan School to "limit going up and down stairs when possible."  D. 46-2 at 63.  BPS, therefore, cannot be said to have taken an adverse an employment action by assigning Hines to work the Tynan School.

Hines' other allegation about BPS's adverse employment actions against her is that BPS promised Hines a series of accommodations in November 2015, D. 22 ¶ 20, but BPS did not provide the accommodations as promised, D. 22 ¶ 22.  It is undisputed that BPS granted Hines an accommodation in 2015, D. 44-7 at 56, but Hines has not provided any evidence that BPS failed to adhere to its terms.  Hines' only contentions about her difficulties in 2015 are that Monopoli "assaulted" her in October 2015 and BPS did not transfer her to a new classroom after the alleged assault.  Hines also reports that she suffered "increased anxiety" in the wake of the alleged assault.  D. 46 at 28; D. 46-2 at 83.  None of these assertions, however, establish a connection between Hines' disability and BPS's treatment of Hines, either by Monopoli or otherwise, in November 2015.[3]

---

[3] Although the Court has addressed this allegation regarding Monopoli, the Court notes that Hines did not mention Monopoli or the alleged assault in her amended complaint and cannot raise new allegations now to defeat summary judgment.  See D. 22 ¶¶ 17-20 (skipping from 2012 claims to November 2015 claims); Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 53 (1st Cir. 2011) (quoting Gilmour v. Gates,

For all of the aforementioned reasons, the Court grants summary judgment to BPS on the disability claim asserted by Hines.

### B. <u>Retaliation</u>

To prevail on a retaliation claim under the Rehabilitation Act or ADA, a plaintiff must show that "(1) s/he engaged in protected conduct," in other words that s/he requested a reasonable accommodation for her disability, "(2) s/he was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action." <u>Smith v. The Pub. Sch. of Northborough-Southborough Mass.</u>, 133 F. Supp. 3d 289, 294 (D. Mass. 2015) (citing <u>D.B. ex rel. Elizabeth B. v. Esposito</u>, 675 F.3d 26, 40–41 (1st Cir. 2012)).

There is no evidence in the record to support Hines' implication that BPS retaliated against Hines for reporting allegedly unlawful treatment based on her disability to various administrative agencies. <u>See</u> D. 22 ¶¶ 7, 13; D. 46 at 7. Even if there were such evidence, a claim based on Hines' reporting would still fail because, as discussed above, Hines did not suffer any adverse action. <u>See</u> <u>Morales-Vallellanes v. Potter</u>, 605 F.3d 27, 36 (1st Cir. 2010) (quoting <u>Broderick v. Donaldson</u>, 437 F.3d 1226, 1232 (D.C. Cir. 2006)) (explaining that "[i]n the absence of a finding that the plaintiff has suffered adverse action, a retaliation claim fails as a matter of law"). Because Hines has failed to show that there remains a disputed issue of material fact that she suffered an adverse action, BPS is entitled to summary judgment on Hines' retaliation claim.

---

<u>McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004)) (explaining that "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)" and a "plaintiff may not amend her complaint through argument in a brief opposing summary judgment").

### C.    Hostile Work Environment

The Court next considers whether Hines experienced a hostile work environment in violation of the ADA or Rehabilitation Act.  A hostile work environment exists when a "workplace [is] permeated with discriminatory intimidation, ridicule, and insult that [is] sufficiently severe or pervasive to alter the conditions of . . . [the worker's] employment and create an abusive working environment."   Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (citations omitted) (applying standard to Rehabilitation Act claim).  To prove a hostile work environment claim, Hines must show:

> that [she] is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership of the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of her employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Walker v. City of Holyoke, 523 F. Supp. 2d 86, 106 (D. Mass. 2007) (quoting Torres-Negrón v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007)).

Even assuming arguendo that Hines were disabled within the statutory meaning of the term, she has not presented any evidence to show that the harassment she perceived was based on her disability.  Even as alleged, the instances of "verbal abuse" she suffered were related to Hines not having good "management skills," D. 22 ¶ 8, Hines' "incompeten[ce]," D. 46 at 13, Hines "not having good communication skills," id. at 15, and Hines' "incoheren[ce]," id. at 18.  See Castro-Medina v. P&G Commercial Co., 565 F. Supp. 2d 343, 378 (D.P.R. 2008) (noting that criticism in the form of "reprimands and negative performance evaluations" does not constitute evidence of a hostile work environment).  Moreover, on this record, such comments are untethered to Hines' alleged disability.  Furthermore, "'stray workplace remarks,' . . . normally are insufficient, standing alone, to establish . . . discriminatory animus."  Thompson v. Coca-Cola Co., 522 F.3d

168, 178 (1st Cir. 2008) (citation omitted).  In sum, Hines has not shown that any reasonable jury could find that she was subject to severe or pervasive harassment due to her alleged disability. Accordingly, the Court grants summary judgment to BPS on this claim.

### D.    Contract Claim

Hines' contract claim arises out of the CBA between Hines' union and BPS.  Hines avers that BPS violated the CBA "on account of [Hines'] disability and [Hines'] exercise of protected rights."  D. 22 ¶ 40.  Specifically, Hines alleges BPS violated the CBA by not having the director of personnel meet with Hines following her allegations of assault by Monopoli, as required by Article II(A)(3)(b) of the CBA.  D. 46 at 9.  Although BPS does not explicitly address Hines' contract claims in its motion for summary judgment and supporting materials, BPS makes clear that it has moved to dismiss Hines' complaint "in its entirety."  D. 44 at 1.  Hines counters that "[b]y not raising the breach of contract claim in its Motion, [BPS] has waived the claim."  D. 46 at 8-9.

The Court concludes that BPS is entitled to judgment as a matter of law on Hines' contract claim because Hines may not "circumvent existing grievance and arbitration procedures" in the CBA by suing her employer directly over incidents that are covered by the CBA.  Azzi v. W. Electric Co., 19 Mass. App. Ct. 406, 410 (1985).  Rather, she must adhere to the grievance procedures established in the CBA.  See D. 44-4 at 37-40 (CBA Article V: Dispute Resolution); Azzi, 19 Mass App. Ct. at 410 (holding that "[a] plaintiff does not have an independent common law claim that would permit [her] to bring an action without invoking the grievance and arbitration procedures [of the CBA]").  Hines could bring a claim directly against BPS based on the CBA only if she first showed that the union "failed in its duty to represent [her] fairly . . . or that [her] employer repudiated or otherwise nullified the grievance procedures."  Azzi, 19 Mass. App. Ct. at

409.  Such a claim must ordinarily be brought in the first instance to the Department of Labor Relations ("DLR"), formerly known as the Massachusetts Labor Relations Commission.  Leahy v. Local 1526, Am. Fed'n. of State, Cty, & Mun. Emps., 399 Mass. 341, 349 (1987).

Here, Hines has no standing to sue under the CBA.  There is no evidence Hines filed a claim against her union at the DLR regarding the contract claim at issue in this case.[4]  Hines also did not name the union as a defendant in this case or assert a claim for breach of the duty of fair representation.  See Penachio v. Town of Saugus, No. 16-P-934, 2017 WL 3091835, at *3 (Mass. App. Ct. July 21, 2017) (affirming trial court's grant of summary judgment for defendant employer where plaintiff brought claims based on CBA directly against the employer and did not first file with the DLR or name union as a defendant in the lawsuit against the employer).  Accordingly, the Court concludes that Hines' contract claim is futile and grants summary judgment to BPS on this claim.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 44.

So Ordered.

/s/ Denise J. Casper
United States District Judge

---

[4] Hines asserts that she filed a grievance against the union with "Labor Relations" in 2010, but does not specify the substance of that grievance.  D. 46 at 21; see D. 46-2 at 23 (Hines testifying that the complaint she filed against the union was time-barred).